# IN THE SUPREME COURT OF TEXAS

══════════
No. 14-0964
══════════

LYDIA LIRA AND ALFONSO LIRA, PETITIONERS,

v.

GREATER HOUSTON GERMAN SHEPHERD DOG RESCUE, INC., RESPONDENT

══════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS
══════════════════════════════════════════════

**PER CURIAM**

In this case we consider whether the trial court properly enjoined a dog rescue organization to return a dog to its original owners. We hold that the trial court's judgment was correct.

Alfonso and Lydia Lira are siblings. They owned a German Shepherd named Monte Carlo. Alfonso purchased Monte for $2,500, and spent another $10,000 on training. Monte was living at Lydia's home in Houston while Alfonso was working in San Antonio. The Liras had raised Monte from a puppy and had owned him as a family pet for seven years. On January 1, 2013, Monte escaped from Lydia's property through an open garage door. Lydia searched for him, posting signs in the neighborhood offering a reward, and making inquiries on several websites. She frequently checked a website, Pet Harbor, where missing dogs are posted. She thought she recognized Monte in two postings, but upon visiting two animal control facilities she found the dogs were not Monte.

Meanwhile, the City of Houston's animal control department, known as BARC (for Bureau of Animal Regulation and Care), picked up Monte on January 2. He was running at large and had no identifying tags or microchip. BARC listed him on Pet Harbor as a Belgian Malinois, and provided a photograph, but Lydia had been searching for him under the German Shepherd listing. BARC had also incorrectly designated Monte an "owner surrender."

At BARC, Monte tested "weak positive" for heartworms. The Liras claim they were giving Monte heartworm pills, but there was testimony that this treatment was ineffective for adult worms. A BARC witness testified that a dog testing positive for heartworms is not considered healthy and therefore cannot be sold to the public.

BARC scheduled Monte to be euthanized on January 7. On January 5, BARC sent a request to local dog rescue organizations to see if any would accept Monte. On January 6, Greater Houston German Shepherd Dog Rescue (GHGSDR) responded. On January 7, BARC gave Monte to a GHGSDR volunteer, Cindy Milstead. Milstead agreed to foster the dog.

On January 9, Lydia saw a message on a lost and found website stating that her dog might be at BARC. Lydia went to BARC and identified Monte from a photograph. BARC told Lydia that Monte had been transferred to GHGSDR. Lydia contacted Milstead that day and asked for Monte's return. Milstead refused. The Liras and their attorney made additional requests for Monte's return, and offered to reimburse GHGSDR for all of its expenses, but GHGSDR refused to return Monte.

The Liras sued GHGSDR, asserting a claim for conversion and other claims. They sought a declaratory judgment that they were the owners of Monte, and an injunction ordering his return. After a bench trial the trial court sided with the Liras. The trial court rendered a judgment that

included a permanent injunction directing GHGSDR to return Monte to the Liras. The trial court did not award actual damages or attorney's fees; the Liras do not complain of this result. The trial court did award costs to the Liras. GHGSDR appealed.

The court of appeals reversed, concluding that the Liras had lost their right to recover possession of Monte from GHGSDR. 447 S.W.3d 365, 368. In their petition for review, the Liras ask that the trial court's judgment be reinstated.

We address the propriety of the trial court's injunction. GHGSDR does not dispute that, prior to the unfortunate events described above, Monte belonged to the Liras. Nothing in the record suggests the Liras abandoned their pet. Lydia diligently searched for Monte until he was found, and the Liras then immediately requested his return. GHGSDR cites no common-law authority, nor can we find any, holding that dog owners' property rights are lost because their dog escapes and cannot be located for a few days. Under the common law, one who finds lost property cannot retain it against a claim by the property's true owner. *State v. $281,420.00 in United States Currency*, 312 S.W.3d 547, 553 (Tex. 2010).

We therefore turn to whether operation of City ordinances divested the Liras of their ownership, as GHGSDR contends. Assuming that the ordinances comport with due process and other requirements of Texas and federal law, and that cities possess police power to enact ordinances that sometimes divest an owner of property rights in his dog, nothing in Houston's ordinances did so in this case.

Section 826.033 of the Texas Health and Safety Code provides that, as part of a rabies control program, a municipality may adopt ordinances providing that "each stray dog or cat be impounded

for a period set by ordinance or rule" and that "a humane disposition be made of each unclaimed stray dog or cat on the expiration of the required impoundment period."

The City has adopted ordinances concerning stray dogs, found in chapter 6 of the Houston Code of Ordinances. We discuss those in effect at the time of the events in issue. Article IV, section 6-102 provided:

> (a)  It shall be the duty of the animal control officers to take up and take charge of all dogs found to be running at large . . . and to take such dogs to the animal control center or other suitable place, there to be impounded for a period of three calendar days.
> (b) . . . . Dogs wearing a city license tag . . . shall be held in designated pens for the owner for six days from the date the owner was notified by telephone or notice was mailed to the owner. On the seventh day following such notice, the animal may be offered for adoption or euthanized at the discretion of the director.

Article V, section 6-137 provided:

> (a) The person entitled to the possession of any animal delivered to the animal control center shall be entitled to have the animal delivered to him at the animal control center upon presentation of satisfactory evidence of ownership . . . and payment of the applicable charges and fees . . . .
> (b)  It shall be the duty of the officer in charge of the animal control center to offer for sale any and all healthy animals impounded under the terms of section 6-102 and not redeemed within three days . . . . The person entitled to the possession of any animal shall be entitled to redeem the same upon paying the purchaser double the amount paid by him for such animal and his reasonable expenses for keeping the same. Any animal not so redeemed within 30 days from the date of the sale shall become the absolute property of the purchaser.
> . . . .
> (d)  The owners of all animals impounded in the animal control center shall be required to redeem the same as provided for in subsection (a) hereof and shall not be permitted to purchase such animal in lieu of paying the redemption fee.
> . . . .
> (g)  . . . [T]he release of the animal shall be conditioned upon an owner's execution of a written agreement that he will have the animal sterilized . . . .

Article V, section 6-138, titled "Disposal of impounded dogs, cats, other animals not redeemed or sold," provided:

> Animals taken up and impounded under the terms of this chapter that are not redeemed as provided in this article shall be disposed of by the city as follows:
> (1) Any animal that is vaccinated and sterilized and is otherwise deemed suitable for adoption may be offered for adoption through a city facility. . . .
> (2) Any animal that is suitable for adoption as a pet and is not placed for adoption through city facilities, may be placed for adoption through a private nonprofit humane shelter. . . .
> . . . .
> (4) All animals that are not placed for adoption shall be destroyed by use of humane euthanasia . . . .

We construe city ordinances under the same rules applicable to the construction of statutes. *Bd. of Adjustment of San Antonio v. Wende*, 92 S.W.3d 424, 430 (Tex. 2002). Thus, our goal is to discern the intent of the city council. *Id.* When possible, we discern such intent from the plain meaning of the words chosen. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). We consider the statute or ordinance as a whole, and "should not give one provision a meaning out of harmony or inconsistent with other provisions, although it might be susceptible to such a construction standing alone." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001).

We also consider as an aid in construction the principle that the law abhors a forfeiture of property. Private property rights are "a foundational liberty, not a contingent privilege." *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Texas, LLC*, 363 S.W.3d 192, 204 n.34 (Tex. 2012). We recently recognized pet dogs as "property in the eyes of the law," and a "special form of personal property." *Strickland v. Medlen*, 397 S.W.3d 184, 185, 192 (Tex. 2013). "A forfeiture of rights of property is not favored by the courts, and laws will be construed to prevent rather than to cause such

5

forfeiture." *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 842 (Tex. 2010) (quoting *Sheppard v. Avery*, 34 S.W. 440, 442 (Tex. 1896)). This rule is surely applicable here, as "a beloved companion dog is not a fungible, inanimate object like, say, a toaster." *Strickland*, 397 S.W.3d at 185–86.

Article IV, section 6-102(a) provided that a stray shall be "impounded" for three days. That term does not suggest a transfer of ownership or the loss of the owner's right to the return of his property. Quite the opposite. Oxford defines "impound" as "to take (*another person's property*) into a pound or into legal custody," and a "pound" as "a place where stray animals . . . are taken and kept *until claimed*." OXFORD AMERICAN DICTIONARY (1980) (emphasis added). Webster's defines "impound" as "to shut up in . . . a pound," and defines "pound" to include "a public enclosure for strays or unlicensed animals" and "a depot for holding personal property *until redeemed by the owner*." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (emphasis added). Black's defines "impound" as "[t]o place (something, such as a car or other personal property) in the custody of the police or the court, often with the understanding that *it will be returned* intact at the end of the proceeding. BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added). The term does not suggest that the City intends to transfer ownership while the pet is held at a city facility. *Compare* TEX. AGRIC. CODE § 142.013 (expressly providing that, after specified notice and impoundment periods, title to stray livestock passes to the county). Section 6-102(b) authorized BARC to euthanize a dog with tags. Putting an animal down is arguably an act so inconsistent with the rights of the owner as to imply a divestment of ownership, but that subsection did not apply because Monte was picked up without tags and was not euthanized.

6

Article V, section 6-137(a) provided for the pound to return a pet to its owner, certainly a "person entitled to the possession of" his pet, upon payment of applicable charges. There is no time limit under this provision on the right to redeem a pet that, for whatever reason, is still in the possession of BARC. This provision again compels the conclusion that a live pet being held at the city pound belongs to the owner and may therefore be redeemed by the owner. Article V, section 6-137(b) provided that if the pet is sold by the City, the original owner has 30 days to redeem the pet, after which time the pet becomes "the absolute property of the purchaser." This subsection indicates that the original owner of the pet maintains a property interest for 30 days from the sale. Section 6-137(b) does not decide today's case because Monte was not sold, and could not be sold because he tested positive for heartworms. But this subsection indicates that even impoundment and then sale of a dog to a third party does not divest the owner of his ownership interest until 30 days after the sale. It also shows that the City can, when it wishes, draft an ordinance that expressly divests an owner of property rights to his dog.

Article V, section 6-138 governed where, as here, the dog was not redeemed or sold by the City. Section 6-138(2) provided that the dog "may be placed for adoption through a private nonprofit humane shelter," and section 6-138(4) provided that dogs not placed for adoption shall be euthanized. Again, while putting down a dog is arguably so inconsistent with the rights of the original owner as to imply a divestment of property rights, nothing in section 6-138 states or implies that a dog merely held by a private shelter, awaiting adoption, has been divested of the ownership rights of the original owner. The Liras argue that GHGSDR is not a "shelter" under section 6-138; regardless, nothing in section 6-138 indicates that transferring a dog from BARC to a private rescue

7

organization, without more, severs the ownership rights of the original owner.

Hence, these ordinances, whether considered individually or as a whole, did not expressly or impliedly divest the Liras of their ownership rights to Monte. Reading the ordinances as not extinguishing ownership is further compelled by the rule that any doubts as to their meaning should be resolved against a forfeiture of property. In short, Monte belonged to the Liras at the time they requested his return, and GHGSDR should have honored that request.

The evidence regarding Monte's positive heartworm test is addressed by the parties. If GHGSDR is suggesting that Monte was mistreated by the Liras, such mistreatment would not entitle GHGSDR to keep Monte. There is a separate statutory regime for removing an animal from its owner due to animal cruelty. *See* TEX. HEALTH & SAFETY CODE § 821.021 *et seq.* That regime was not invoked here.

\* \* \*

The trial court correctly held that Monte belonged to the Liras and properly enjoined GHGSDR to return him to his owners. We reverse the judgment of the court of appeals and render judgment reinstating the trial court's judgment.

**OPINION DELIVERED:** April 1, 2016