

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-24-00300-CV

**SAN ANTONIO FAMILY ASSOCIATION**, Texas Right to Life, Texas Leadership Coalition, Texans for Fiscal Responsibility, Bexar County Republican Party, Allied Women's Center of San Antonio, San Antonio Coalition for Life, Texas Eagle Forum, Unite San Antonio, Patrick Von Dohlen, Michael R. Knuffke, Daniel J. Petri, K. Jason Khattar, Susan Bayne, Aileen Boone, Kevin Choate, Marilyn Choate, Elizabeth Anne Comeaux, Paul Julienne Comeaux, Sonia Cantoral, Eli Danze, Alice Davis, Dennis Dewine, Robert Gonzalez, Sandra Kaye Kiolbassa, Agustín McLamb-Quiñones, David Nelson, Aloys Joseph Notzon, Anna Rojas, Philip Trickett, Doris Walsh, Von Dohlen Knuffke Financial Group Inc., Khattar Law Office, and Hartzheim Petri CPA,
Appellants

v.

The **CITY OF SAN ANTONIO**, Ron Nirenberg, in his official capacity as mayor of the City of San Antonio, and Erik Walsh, in his official capacity as city manager of the City of San Antonio,
Appellees

From the 438th Judicial District Court, Bexar County, Texas
Trial Court No. 2023CI22459
Honorable Cynthia Marie Chapa, Judge Presiding

Opinion by: Rebeca C. Martinez, Chief Justice
Dissenting Opinion by: H. Todd McCray, Justice

Sitting:      Rebeca C. Martinez, Chief Justice
              Irene Rios, Justice
              H. Todd McCray, Justice

Delivered and Filed: June 30, 2025

AFFIRMED

Appellants sued the City of San Antonio (the "City"), its mayor, and its city manager[1] for declaratory and injunctive relief related to a provision in the City's fiscal year 2024 budget that allots $500,000 to a "Reproductive Justice Fund." These defendants, who are the appellees here, filed a plea to the jurisdiction, contending that the lawsuit should be dismissed because appellants lack standing and their claims are not ripe. The trial court granted appellees' plea and dismissed the claims without prejudice. On appeal, appellants argue dismissal was erroneous because the claims were ripe, appellants had taxpayer standing, and the trial court ruled on the plea before appellants had completed jurisdictional discovery. We affirm the trial court's order.

## BACKGROUND

In September 2023, the City adopted its fiscal year ("FY") 2024 budget. The City's FY 2024 ran from October 1, 2023, to September 30, 2024. Its FY 2024 budget includes a line item in the amount of $500,000.00 for a "Reproductive Justice Fund."

In October 2023, appellants sued appellees. Appellants' third amended petition, which was their live petition when the trial court dismissed their claims, alleges that appellants pay taxes to the City.[2] Further, the petition alleges that the City's Reproductive Justice Fund "will provide grants to organizations that pay the travel costs of pregnant women who leave the state to abort their unborn children, *and [appellees] intend to give this taxpayer money to abortion-assistance organizations that pay for abortion travel*" (emphasis added). This italicized portion indicates additions to appellants' second amended petition compared to their original petition. Appellants filed their second amended petition on March 18, 2024, and they carried over these allegations to

---

[1] The mayor and city manager are sued in their official capacities, which "is simply another way of pleading an action against the governmental unit by which the official is employed." *Donohue v. Butts*, 516 S.W.3d 578, 581 (Tex. App.—San Antonio 2017, no pet.) (mem. op); *see also Franka v. Velasquez*, 332 S.W.3d 367, 383 (Tex. 2011).

[2] Additionally, for those appellants that are organizations, appellants allege that members of those organizations include such taxpayers. The composition of individuals and entities suing the City changed slightly between the first and third petitions, but the changes are not relevant to the legal issues in this appeal.

their third amended petition, filed on March 25, 2024. Appellants' third amended petition further alleges:

> The organizations that lobbied for this budgetary provision and hope to obtain this taxpayer money include Jane's Due Process, Avow, the Buckle Bunnies Fund, Sueños Sin Fronteras, and the Lilith Fund for Reproductive Equity. Many of these organizations facilitate or subsidize out-of-state abortions performed on Texas residents, and Jane's Due Process has already announced that it intends to use the money it receives from the [C]ity's Reproductive Justice Fund to pay the travel costs of minors who leave the state for an abortion. The Buckle Bunnies Fund also aids or abets illegal self-managed abortions in Texas.

(footnote omitted). Additionally, appellants allege, as first stated in their second amended petition and carried over into their live petition: "[Appellees] intend to give some or all of the $500,000.00 in taxpayer money that was allocated to the Reproductive Justice Fund to abortion-assistance organizations . . . ." All allegations about appellees' intent were added beginning with appellants' second amended petition.

Consistent across all of appellants' pleadings was the assertion that appellants "bring suit to enjoin the [C]ity and its officials from providing taxpayer money to any organization that pays for abortion travel or that procures elective abortions for Texas residents." Additionally, citing to Texas Revised Civil Statutes article 4512.1[3] and Texas Penal Code section 1.04(a)(1),[4] appellants contend: "It is a criminal offense to engage in conduct in Texas that 'procures' a drug-induced

---

[3] Article 4512.1 provides:

> If any person shall designedly administer to a pregnant woman or knowingly procure to be administered with her consent any drug or medicine, or shall use towards her any violence or means whatever externally or internally applied, and thereby procure an abortion, he shall be confined in the penitentiary not less than two nor more than five years; if it be done without her consent, the punishment shall be doubled. By "abortion" is meant that the life of the fetus or embryo shall be destroyed in the woman's womb or that a premature birth thereof be caused.

TEX. REV. CIV. STAT. ANN. art. 4512.1. Because it is not determinative of this appeal, we take no position on whether article 4512.1 has been repealed. *Cf. McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004) (holding article 4512.1 was repealed by implication); *Fund Tex. Choice v. Paxton*, 658 F. Supp. 3d 377, 411 (W.D. Tex. 2023) (same).

[4] Section 1.04(a)(1) provides: "This state has jurisdiction over an offense that a person commits by his own conduct or the conduct of another for which he is criminally responsible if: . . . either the conduct or a result that is an element of the offense occurs inside this state." TEX. PEN. CODE ANN. § 1.04.

abortion — even when the abortion is performed out of state — so long as the procuring conduct occurs within the state of Texas." Appellants also have consistently contended, citing to *Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010):[5] "Any grant of taxpayer money to criminal organizations that violate the state's abortion laws is an *ultra vires* act that must be enjoined, regardless of how the recipient organization intends to use the money."

Based upon these allegations, appellants assert four claims for declaratory and injunctive relief, which have remained the same throughout all petitions, describing their claims as follows:

- CLAIM NO. 1: The Texas Abortion Statutes Outlaw And Criminalize The Provision Of Money To Organizations In Texas That "Procure" Drug-Induced Abortions, Even If The Procured Abortion Occurs Out Of State

- CLAIM NO. 2: The Texas Abortion Statutes Outlaw And Criminalize The Provision Of Money To The Buckle Bunnies Fund, Which Aids And Abets Illegal Self-Managed Abortions in Texas

- CLAIM NO. 3: The Texas Abortion Statutes Outlaw And Criminalize The Provision Of Money To Organizations That Aid Or Abet Drug-Induced Abortions If Either Of The Two Abortion Pills Is Swallowed In Texas

- CLAIM NO. 4: The Reproductive Justice Fund Violates The State Constitution's Gift Clause[6]

---

[5] The supreme court held in *Holder* that a statute prohibiting the provision of "material support or resources" to certain foreign terrorist organizations was constitutional as applied to prohibit monetary contributions the plaintiffs wished to provide to support the humanitarian and political activities of two organizations the Secretary of State had designated as foreign terrorist organizations. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 7–10, 30-33 (2010) (discussing 18 U.S.C. § 2339B(a)(1)).

[6] Appellants gift-clause claim is based upon appellants' contention that the predominant purpose of expenditures from the Reproductive Justice Fund "is to benefit private parties: the abortion-assistance organizations and the pregnant women who travel out of state to kill their unborn children," and that "[t]here is no 'clear public benefit' from providing taxpayer subsidies to organizations that help women abort their pregnancies in another state." *See* TEX. CONST. art. III, § 52(a); *Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 383 (Tex. 2002) ("[S]ection 52(a) does not prohibit payments to individuals, corporations, or associations so long as the statute requiring such payments: (1) serves a legitimate public purpose; and (2) affords a clear public benefit received in return.").

Appellants, specifically demand:

- [A] declaration that the provision in the [C]ity's budget establishing the Reproductive Justice Fund is invalid because it is "inconsistent with . . . the general laws enacted by the Legislature of this State" under article XI, section 5 of the state constitution;[7]

- [A] declaration that the provision in the [C]ity's budget establishing the Reproductive Justice Fund is invalid because it violates the state constitution's gift clause;[8]

- [A] declaration that the Reproductive Justice Fund may not be used to provide any taxpayer money to Jane's Due Process, Avow, the Buckle Bunnies Fund, the Lilith Fund for Reproductive Equity, or any other organization in Texas that "procures" drug-induced abortions, aids or abets self-managed abortions in Texas, or aids or abets drug-induced abortions in which the pregnant woman swallows either of the two abortion-inducing drugs in Texas, or expels her unborn child in Texas; [and]

- [A] temporary and permanent injunction that prohibits the defendants from providing any taxpayer money to Jane's Due Process, Avow, the Buckle Bunnies Fund, Sueños Sin Fronteras, the Lilith Fund for Reproductive Equity, or any organization in Texas that "procures" drug-induced abortions, aids or abets self-managed abortions in Texas, or aids or abets drug-induced abortions in which the pregnant woman swallows either of the two abortion-inducing drugs in Texas, or expels her unborn child in Texas.

After filing their original petition, appellants sought discovery from appellees and the nonparty organizations referenced in the petition. In January 2024, appellees filed a plea to the jurisdiction, challenging whether the case was ripe for adjudication and whether appellants had standing to assert their claims. The same day that appellees filed their plea, the City also filed a motion for a protective order, arguing that any discovery outside of the jurisdictional issues raised by the plea should not be allowed. Later, the nonparties from whom discovery was sought filed motions for protective orders.

On March 21, 2024, appellants filed motions to compel the discovery they had initially sought, arguing all discovery requests were relevant to the jurisdictional issues. The following day, appellants filed responses to appellees' plea to the jurisdiction and motion for protective order.

---

[7] *See* TEX. CONST. art. XI, § 5.
[8] *See* TEX. CONST. art. III, § 52(a).

On March 25, 2024, appellants filed a motion for a continuance of the plea to the jurisdiction hearing, scheduled for March 28, 2024.

On March 25, 2024, appellees filed a supplement to their plea to the jurisdiction. In their supplement, appellees assert that appellants made "false allegations" in their second amended petition that were carried over into their third amended petition "in an effort to shield their lawsuit from jurisdictional challenges." Two days later, on March 27, 2024, appellees filed a reply in support of their plea, which includes as exhibits an unsworn declaration of Dr. Claude A. Jacob and an affidavit sworn by Justina Tate.

Jacob states in his declaration that he is the Public Health Director of the San Antonio Metropolitan Health District ("Metro Health") and is responsible for overseeing Metro Health's budget. Jacob declares:

> In FY 2024, Metro Health is scheduled to make recommendations to the City Council about parameters for allocation of the Reproductive Justice Fund. The first presentation of that nature is scheduled to occur on April 10, 2024, during the B session of the City Council's meeting. Metro Health has been preparing for that presentation but has not finalized its recommendations as to the potential uses of the Reproductive Justice Fund.

> After Metro Health receives the City Council's direction as to potential uses of the Reproductive Justice Fund, Metro Health is scheduled to oversee a request for proposal ("RFP") process for the Reproductive Justice Fund. All organizations that submit proposals during the RFP process will be required to meet city procurement, contracting, and audit criteria. Because the RFP process has not begun, no organization has applied to receive any part of the Reproductive Justice Fund. I anticipate the RFP process to begin in the late spring or early summer of 2024 and to continue through the summer of 2024, at a minimum. After the RFP process ends, Metro Health will identify potential recipients of money from the Reproductive Justice Fund. However, Metro Health will not be able to execute any contract with any organization until after Metro Health obtains the City Council's approval to do so. I anticipate contracts being executed in the winter of 2024–2025. No expenditure of the Reproductive Justice Fund will occur until after contract execution occurs.

Tate states in her affidavit that she is the Management and Budget Director for the City of San Antonio and, in that position, monitors the City's FY 2024 budget and expenses made pursuant to that budget. According to Tate, the Reproductive Justice Fund is an "approved expenditure amendment" to the City's FY 2024 budget in the amount of $500,000.00. She avers:

> As of today, no amount of that money has been spent, and the City Council has not decided how to spend any of that money.
>
> During the B session of the City Council's meeting on April 10, 2024, [Metro Health] is scheduled to make a presentation to the City Council about potential options for allocation of the Reproductive Justice Fund. The City Council may discuss options during the B session, but it will not take any action relating to fund allocation during the B session. No decisions have been made as to when such action will occur.
>
> Before there can be any actual expenditure of any amount of the Reproductive Justice Fund, Metro Health will have to complete a request for proposal ("RFP") process and then, the City Council will have to approve — through votes cast during a public City Council meeting — the execution of contracts with the recipients of money from the Reproductive Justice Fund.

The day after appellees filed their reply, the trial court held a hearing on the plea as scheduled.[9] After the hearing, the trial court took the matter under advisement. Judge's notes reflect that the trial court allowed appellants until April 11, 2024 to file a sur-reply to the plea.[10]

On April 11, 2024, appellants filed their sur-reply. In their sur-reply, appellants argue that the Jacob declaration and the Tate affidavit do not contradict appellants' allegations that the City "will provide" and "intends to give" taxpayer money to "abortion funds." Appellants also argue their entitlement to depose Jacob and Tate. Appellants' counsel provided a declaration, stating:

> We have not yet completed jurisdictional discovery in this case. I intend to depose city officials, including Claude A. Jacob and Justina Tate whether [sic] city officials believe that abortion funds are eligible or ineligible for this taxpayer money, and whether the [C]ity (and the nonparty abortion funds) believe that there are any limits on how money from the Reproductive Justice Fund may be used. I also

---

[9] We do not have a reporter's record from the hearing.

[10] In their reply brief, appellants acknowledge this "two-week post-hearing window that the district court provided to file their sur-reply."

intend to depose city officials on whether and to what extent they believe the law of Texas allows them to spend taxpayer money on abortion travel. And I intend to depose city officials and city council members to determine whether they intend to use the Reproductive Justice Fund to pay for abortion travel, especially in light of the comments that were made at the City Council B session held April 10, 2024. We need this discovery to refute the [C]ity's denial that it intends to spend taxpayer money on abortion travel or grants to abortion-assistance organizations.

Appellants' counsel provided a link to the referenced City Council session. According to appellants in their sur-reply, the Mayor's and city councilmember's remarks during the session,

> show that Mayor Nirenberg — plus at least five members [of] city council — want and intend to spend taxpayer money in the Reproductive Justice Fund for abortion travel and grants to abortion funds. That is more than enough to establish a genuine issue of fact regarding the [C]ity's intent, notwithstanding the Jacob declaration and the Tate affidavit, which is all [appellants] need to defeat the plea to the jurisdiction.

The remarks that appellants reference include:[11]

- Mayor Nirenberg: "I'm grateful for a city council that is willing to have a conversation on what we can do locally;" "The American College of Obstetricians and Gynecologists . . . states in very plain terms: 'The fact is, abortion is an essential component of women's health care.'"

- Councilmember Melissa Cabello Havrda: "I'm going to be clear that my firm commitment is that these funds should be used to help women make choices about their bodies, about their health, and about their future. That includes access to options they can only get outside of Texas — to be clear, traveling out of state to obtain abortions. The Reproductive Justice Fund is about giving women in Texas the option to make their own decisions and not have restrictions forced upon them."

- Councilmember Phyllis Viagran: "I remember where I was when Roe v. Wade was reversed. . . , when our Congress and Senate failed to legalize abortion, this became not just a women's issue, but a human-rights issue, because women are humans."

- Councilmember Sukh Kaur: "The percentage decrease in abortions for black and Hispanic women is significantly higher than for white women. This is an incredibly important issue. I am honored that us as a council are having this discussion and that we have put this fund forward so that we can help women that really need it in our city. . . . I want to reiterate Councilwoman Castillo's statistic that she shared: 26,000 rape pregnancies since we are not allowed to have abortions in the state of Texas. That is a significant number that cannot be ignored. And so, that being said, that would be my explicit request."

---

[11] Appellants provided the following transcriptions in their sur-reply, and appellants' counsel declares in his declaration that the transcriptions are accurate. Appellees have not contested the accuracy of these transcriptions.

- Councilmember Jalen McKee-Rodriguez: "The Reproductive Justice Fund here in San Antonio was initially created to support and uplift various communities who are facing this crisis on the front lines with one-on-one logistical support, pre-natal support, and post-partum care. Many are forced to travel hundreds of miles and several hours out of state to access abortion care, adding to personal costs into the thousands. And I want to see us explicitly address those needs through our solicitation."

Appellants' counsel also authenticated, through his declaration, a slideshow presented by Jacob at the April 10, 2024 city council meeting. The slideshow, which is an exhibit to appellants' sur-reply, lists "current needs" for the Reproductive Justice Fund, which are categorized as "upstream," "midstream," and "downstream." The slideshow lists as an upstream need to "support capacity-building initiatives" in the areas of food and housing. Midstream needs include sexual health education and contraception training for family medicine providers. Downstream needs include home pregnancy tests, emergency contraception, transportation to prenatal care, telehealth visits for STIs, and "[t]ransportation to abortion care." This is the only need that references abortion in the presentation. A slide titled "RFP Criteria" states "preference will be given to organizations that . . . [i]nclude upstream/midstream approaches." A further slide shows a timeline of "Summer 2024: RFP," "Fall 2024: Council Action," "Winter '24–'25: Contracts Executed," and "FY25–26: Implementation."

On April 24, 2024, the trial court granted appellees' plea to the jurisdiction, and appellants timely appealed. Appellants contend on appeal that they alleged taxpayer standing and ripeness, that appellees' evidence does not conclusively negate jurisdictional facts, and that the trial court should have postponed ruling on the plea until appellants had completed jurisdictional discovery. Appellees argue the opposite. Throughout their brief, they contend that the evidence demonstrates the City has made no determination about how to spend money from the Reproductive Justice Fund. In response, appellants point to statements made at the April 10, 2024 city council meeting

as evidence "showing that the [M]ayor and a majority of the city council members *have* decided that the Reproductive Justice Fund should pay for abortion travel," or, at the very least, that there is a fact issue regarding the City's intentions.

After this appeal was submitted, appellants filed a letter, on December 26, 2024, bringing to our attention developments "that 'may' raise a question of mootness," although appellants assert that they do not believe these developments moot the appeal. According to appellants' letter: "Last month, the city council approved a $500,000.00 'Reproductive Justice Fund' but did not include funding for abortion travel and did not award money to abortion funds that might pay for such travel." Nevertheless, appellants assert the appeal is not moot because they seek costs and attorney's fees under the Uniform Declaratory Judgment Act, which provides that a court "may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. Appellants also argue that the case is not moot because "the [M]ayor and city councilmembers have made clear that they intend to use taxpayer money to pay for abortion travel through mechanisms other than the recently approved Reproductive Justice Fund." Appellees filed a letter in response, contending appellants' arguments against mootness are "unpersuasive," and that appellants' letter "demonstrates exactly why [appellants] lacked standing to file this lawsuit . . . and why this [l]awsuit was never ripe for adjudication and never should have been filed."

Because appellees' letter points back to their ripeness arguments, because these ripeness arguments implicate subject-matter jurisdiction, and because the parties' ripeness arguments are more fully developed than their mootness arguments, which also implicate subject-matter jurisdiction, we decide this appeal on ripeness grounds.[12] We hold, for the reasons that follow,

---

[12] Without exploring mootness further, we note the Texas Supreme Court has stated:

that the trial court correctly dismissed appellants' claims on ripeness grounds and that the trial court did not abuse its discretion by ruling on the plea when it did. Because we decide this appeal on ripeness grounds, we do not consider appellees' challenge to appellants' taxpayer standing. *See Rattray v. City of Brownsville*, 662 S.W.3d 860, 868 (Tex. 2023) ("Just one valid jurisdictional obstacle is enough for the court to halt further proceedings."); *see also* TEX. R. APP. P. 47.1.

RIPENESS

**Standard of Review**

A plea to the jurisdiction challenges the trial court's power to exercise subject-matter jurisdiction over a claim. *Tex. Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). We review a trial court's decision on a plea to the jurisdiction *de novo*. *Tex. Health & Human Servs. Comm'n v. Pope*, 674 S.W.3d 273, 280–81 (Tex. 2023).

"A plea to the jurisdiction may challenge the pleadings, the existence of jurisdictional facts, or both." *Tex. Dep't of Crim. Just. v. Rangel*, 595 S.W.3d 198, 205 (Tex. 2020) (citation omitted). When a plea to the jurisdiction challenges the pleadings, "we determine if the plaintiff has alleged facts affirmatively demonstrating subject-matter jurisdiction." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). "If, however, the plea challenges the existence of jurisdictional facts, we must move beyond the pleadings and consider evidence when necessary to

---

If the statute allows a non-prevailing party to recover fees under equitable principles, the claim for fees always breathes life into a case that has otherwise become moot, because the trial court must always consider the relative merits of the parties' positions (among other factors) when exercising its discretion to award fees to either party.

*State v. Harper*, 562 S.W.3d 1, 7 (Tex. 2018). The Uniform Declaratory Judgment Act allows for an award of fees under equitable principles; however, the parties have not briefed whether the Act applies when, as here, appellants assert only taxpayer standing. *Compare* TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a) (permitting declarations for "[a] person . . . whose rights, status, or other legal relations are affected by a . . . municipal ordinance") *with Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 556 (Tex. 2000) ("[A] taxpayer has standing to sue in equity to enjoin the illegal expenditure of public funds, even without showing a distinct injury.").

resolve the jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim." *Id.* at 770–71.

In 2004, the Texas Supreme Court specified that, if a plea challenges the existence of jurisdictional facts with supporting evidence, a court utilizes a process in determining the plea that "mirrors that of a traditional motion for summary judgment." *Id.* at 771. "Initially, the defendant carries the burden to meet the summary judgment proof standard for its assertion that the trial court lacks jurisdiction." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012). "[I]f it does so, the plaintiff must then 'show that a disputed material fact exists regarding the jurisdictional issue.'" *Pope*, 674 S.W.3d at 281 (quoting *Mission*, 372 S.W.3d at 635). "When a fact issue exists, the plea to the jurisdiction should be denied." *Pope*, 674 S.W.3d at 281. On the other hand, "[i]f the plaintiff fails to raise a fact question on the jurisdictional issue or the relevant evidence supporting the defendant's assertion is undisputed, the plea to the jurisdiction must be granted as a matter of law." *Id.* "'[I]n determining whether a material fact issue exists, we must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor.'" *Pope*, 674 S.W.3d at 281 (quoting *Alamo Heights*, 544 S.W.3d at 771). "In doing so, 'we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not.'" *Pope*, 674 S.W.3d at 281 (quoting *Alamo Heights*, 544 S.W.3d at 771).

"[D]ispositive-pleading practice has evolved" since 2004. *City of Austin v. Powell*, 704 S.W.3d 437, 446 (Tex. 2024).

> Just as the Texas rules now include not only traditional summary judgment but also no-evidence summary judgment and dismissal under Rule 91a, for example, pleas to the jurisdiction may involve competing evidence, the denial of any probative evidence, or the assertion that the law compels a result regardless of the evidence.

*Id* at 447. "The conceptual similarity [between pleas to the jurisdiction and dispositive pleadings] largely reflects that the parties' burdens will depend on the nature of the plaintiff's claim and how the government poses its jurisdictional challenge." *Id.* For example, a plea may mirror a no-evidence motion for summary judgment. If so, the process for resolving the plea mirrors that for resolving a no-evidence summary judgment motion. *See id.* at 448 (reviewing whether plaintiff raised a fact issue regarding waiver of governmental immunity because city's plea to the jurisdiction "most closely mirror[ed] a no-evidence motion for summary judgment"); *see also* TEX. R. CIV. P. 166a(i).

**Applicable Law**

"[R]ipeness examines when an action may be brought." *Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998). It "emphasizes the need for a concrete injury for a justiciable claim to be presented." *Id.* "To constitute a justiciable controversy, there must exist a real and substantial controversy involving a genuine conflict of tangible interests and not merely a theoretical dispute." *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 685 (Tex. 2020) (quoting *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995)). "At the time a lawsuit is filed, ripeness asks whether the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote." *Patterson*, 971 S.W.2d at 442. "A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass." *Id.* at 443. "Ripeness thus focuses on whether the case involves 'uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id.* at 442 (quoting 13A Charles A. Wright et al., *Federal Practice and Procedure* § 3532, at 112 (2d ed. 1984)).

"By focusing on whether the plaintiff has a concrete injury, the ripeness doctrine allows courts to avoid premature adjudication, and serves the constitutional interests in prohibiting advisory opinions." *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 852 (Tex. 2000). "The ripeness doctrine conserves judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998). Moreover, "[r]ipeness concerns not only whether a court *can* act — whether it has jurisdiction — but prudentially, whether it *should*." *Perry v. Del Rio*, 66 S.W.3d 239, 249–50 (Tex. 2001). "The doctrine's focus on 'waiting for cases' timely factual development' allows 'the proper development of the state's jurisprudence' and prevents excessive intrusion from courts on the policymaking domains of the other branches of government." *State v. City of Austin*, No. 03-20-00619-CV, 2021 WL 1313349, at *8 (Tex. App.—Austin Apr. 8, 2021, no pet.) (mem. op.) (quoting *Patterson*, 971 S.W.2d at 443).

**Discussion**

Appellees' plea, when initially filed, was directed primarily at appellants' pleadings. For instance, appellees assert in their plea:

> [Appellants] have pleaded no facts showing that the City is spending or plans to spend taxpayer money (or any money) through the Reproductive Justice Fund on out-of-state abortion travel or assistance with self-managed abortion in Texas, the challenged "illegal activity."

Later, after appellants amended their pleadings to assert that appellees "intend to give . . . taxpayer money to abortion-assistance organizations that pay for abortion travel," appellees supplemented their plea and provided the Jacob declaration and the Tate affidavit. These exhibits, as stated in appellees' reply in the trial court, demonstrate that "the City has not made a decision about how to spend money from the Reproductive Justice Fund." Appellees also asserted in their reply that appellants know their allegations regarding intent "are not true." The trial court held a hearing on

the plea, and, two weeks later, appellants filed a sur-reply, with an affidavit from counsel authenticating statements made by the Mayor and councilmembers and a slideshow presented by Jacob at an April 10, 2024 city council meeting.

Under these circumstances, appellees' plea most closely mirrors a hybrid motion for summary judgment, one that raises traditional and no-evidence grounds, and both parties submitted evidence. *Cf. City of Austin v. Powell*, 704 S.W.3d 437, 448 (Tex. 2024) (determining plea "most closely mirrors a no-evidence motion for summary judgment"). "Where . . . a trial court grants a motion for summary judgment that raises traditional and no-evidence grounds and both parties present evidence, the ultimate issue is whether the nonmovant raised a fact issue to preclude summary judgment." *Fossil Grp., Inc. v. Harris*, 691 S.W.3d 874, 882 (Tex. 2024); *see* TEX. R. CIV. P. 166a(c), (i); *Powell*, 704 S.W.3d at 447; *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 790 (Tex. 2019) (noting, when both parties present summary-judgment evidence on a hybrid motion, the varying burdens for the different types of motions are immaterial). Applying the mirroring standard, the ultimate issue is whether appellants have raised a fact issue as to ripeness.[13]

We hold appellants have not raised such a fact issue. Appellants' claims are all premised upon their contention that any expenditure of money allocated by the City in its FY 2024 budget to the Reproductive Justice Fund is an illegal expenditure if it is used to pay for "the travel costs of pregnant women who leave the state to abort their unborn children," or if it is provided "to any

---

[13] Appellants argue that appellees must "conclusively negate" their allegations that the City "will provide" or "intend[s] to give" taxpayer money to abortion-assistance organizations or for abortion travel. However, as explained, the mirroring summary judgment standard does not require conclusive negation. Even were we to consider the City's plea under a standard mirroring a traditional motion for summary judgment, appellees' burden first would be to assert and support with evidence that the trial court lacks subject-matter jurisdiction, and then it would be appellants' burden to show a material fact issue regarding jurisdiction. *See Tex. Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004). Under this standard, appellees would meet their initial burden through the Tate affidavit, Jacob declaration, and the April 10, 2024 slideshow, which together show that the City, as of April 10, 2024, had not yet decided which services to fund and that any funding to abortion-assistance organizations or for abortion travel depends upon contingent future events. *Patterson*, 971 S.W.2d at 444.

organization that pays for abortion travel or that procures elective abortions for Texas residents."[14] However, the jurisdictional evidence shows that these claims depend upon "the occurrence of contingent future events that may not occur as anticipated or may not occur at all." *Patterson*, 971 S.W.2d at 444. By October 2023, when this lawsuit was filed, Metro Health had not yet made recommendations "about parameters for allocation," according to Jacob. Even by April 2024, when the City's plea was decided, Metro Health's recommendations largely focused on "upstream" and "midstream" needs, which do not concern abortion travel or payments to abortion-assistance organizations. In fact, a slide presented at the city council's April 10, 2024 meeting states, "preference will be given to organizations that . . . [i]nclude upstream/midstream approaches."

Thus, according to the evidence, in April 2024, when the trial court decided the City's plea, the RFP process had not begun, applications had not been submitted, Metro Health had not identified any potential recipients of money, and city council had not approved any contracts. Accordingly, multiple contingencies existed to interrupt the execution of contracts to abortion-assistance organizations or for abortion travel, making it "mere speculation" that the City would expend appropriated funds in an allegedly illegal manner. *See Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 852 (Tex. 2000) (holding harm from challenged student-promotion plan was too speculative where asserted harm was contingent upon student performance on standardized tests and, if necessary, subsequent performance in remediation program); *see Patterson*, 971 S.W.2d at 444 (holding threat of federal funding cut was too speculative where state agency had not finalized

---

[14] The dissent contends that if the case was not ripe when filed, it has become ripe with the allocation of an additional $100,000 to the Reproductive Justice Fund. However, the referenced $100,000 was allocated from the City's "FY 2025 General Fund Budget," but appellants' petition challenges only the City's FY 2024 allocations. *See* San Antonio, Tex., Ordinance 2025-04-03-0224 (Apr. 3, 2025). Therefore, the new allocation has no bearing on appellants' claims, and no party asserts it does. *Cf. Cunningham v. Parkdale Bank*, 660 S.W.2d 810, 813 (Tex. 1983) ("[A] party may not be granted relief in the absence of pleadings to support that relief.").

plans that could provoke funding cut and the federal response to any such plans was simply unknown).

We cannot say, as appellants argue, that fact issues remain as to "whether the [C]ity or its officials intend to award taxpayer money to abortion funds or whether there is a 'substantial risk' that they will do so."[15] To the contrary, evidence shows that the City's intent had not formed. As Tate explained, the City would authorize expenditures through a vote cast during a city council meeting following the RFP process. *Cf. Lira v. Greater Houston German Shepherd Dog Rescue, Inc.*, 488 S.W.3d 300, 304 (Tex. 2016) (explaining courts discern city-council intent, when possible, from the plain meaning of the words chosen in city ordinances). To be sure, some of the statements at the April 10, 2024 city council meeting show that taxpayer funding for out-of-state travel for abortions was under consideration. It may even have been an "aspiration," as appellants describe it, for the Mayor and certain councilmembers. However, as Mayor Nirenberg remarked, the council was "willing to have a conversation on what we can do locally." Appellants have not directed us to any evidence or authority to suggest that statements made by the Mayor and some councilmembers, in a preliminary conversation, absent a vote, have authority to bind the City or express anything other than those individuals' opinions at the time. *Cf. City of Denton v. Grim*, 694 S.W.3d 210, 215–16 (Tex. 2024) ("[T]he actions of a lone council member are generally not the actions of the city itself.").

Moreover, individual opinions of the Mayor and councilmembers were subject to change. For this reason, the ripeness doctrine incorporates the prudential concern that courts not intrude

---

[15] With the phrase "substantial risk," appellants' reference the standard for a concrete injury. *See, e.g. Grassroots Leadership, Inc. v. Tex. Dep't of Fam. & Protective Servs.*, 646 S.W.3d 815, 820 (Tex. 2022) ("[A] substantial risk may satisfy the concrete-injury requirement for injunctive relief . . . ."); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 447 (Tex. 1993) ("A substantial risk of injury is sufficient under *Hunt*[ *v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)]," for associational standing). However, because we decide this appeal on ripeness grounds, we utilize only the phrases and standards that have developed in the ripeness context. *See e.g.*, *Patterson*, 971 S.W.2d at 442 (discussing whether injury "is likely to occur").

upon the policymaking domains of the politically accountable branches of government. *See Perry v. Del Rio*, 66 S.W.3d 239, 249–50 (Tex. 2001); *Patterson*, 971 S.W.2d at 443. Indeed, facts never developed, as appellants anticipated. *See Patterson*, 971 S.W.2d at 442. Despite asserting in their brief that "the grants of taxpayer money to abortion funds are a *fait accompli*," appellants advised us by letter after this appeal had been submitted: "Last month, the city council approved a $500,000.00 'Reproductive Justice Fund' but did not include funding for abortion travel and did not award money to abortion funds that might pay for such travel."

In short, when appellants' lawsuit was filed and when appellees' plea was decided,[16] funding for out-of-state abortions and abortion-assistance organizations was "a hypothetical situation which might or might not arise at a later date," depending upon several contingencies during the RFP process and on a city council vote approximately a year away. *Patterson*, 971 S.W.2d at 443 (quoting *Camarena v. Tex. Emp. Comm'n*, 754 S.W.2d 149, 151 (Tex. 1988)). While it is true that appellants do not have to wait until an allegedly illegal expenditure of taxpayer money has been made, they must wait until the threat of such an expenditure is "more than conjectural, hypothetical, or remote." *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69, 78 (Tex. 2015). *Compare City of Killeen v. Oncor Elec. Delivery Co. LLC*, No. 03-23-00063-CV, 2025 WL 648521, at *6–7 (Tex. App.—Austin Feb. 28, 2025, no pet. h.) (holding case was ripe where city had taken every step prerequisite to filing a condemnation suit). That is not the situation here; therefore, we affirm the trial court's dismissal of appellants' claims on ripeness grounds.

---

[16] We consider ripeness at both times because "just as a case may become moot after it is filed, it may also ripen." *Perry v. Del Rio*, 66 S.W.3d 239, 251 (Tex. 2001).

**TIMING OF THE TRIAL COURT'S RULING**

Appellants also contend that the trial court should have postponed ruling on appellees' plea until after appellants had completed jurisdictional discovery and that the trial court's failure to do so was reversible error.

In December 2023, appellants served discovery requests on the City and subpoena notices on seven nonparties, including four organizations referenced in appellants' petition. From December 2023 to February 2024, the City and the nonparties filed motions for protective orders, and the City provided some discovery responses. As described above, appellants amended their petition on March 18, 2024, to allege the City's intent for the first time. On March 21 and 22, 2024, appellants filed a motion to compel discovery responses and a response to the City's motion for protective order. Several days later, on March 25, 2024, appellants filed a motion to continue the hearing on appellees' plea to the jurisdiction, set for March 28, 2024, until appellants "complete their discovery into the taxpayer-standing and ripeness issues." In their motion, appellants argued that ripeness,

> turn[s] on questions of fact, such as whether the nonparty abortion funds intend to apply for taxpayer grants from the Reproductive Justice Fund, whether city officials believe that abortion funds are eligible or ineligible for this taxpayer money, and whether the city (and the nonparty abortion funds) believe that there are any limits on how money from the Reproductive Justice Fund may be used.

Appellants also argued they needed discovery responses, "so they can determine whether there is a 'substantial risk' or whether it is 'likely' that the [C]ity will spend taxpayer money unlawfully."

On March 27, 2024, appellees filed the Jacob declaration and the Tate affidavit, and the following day, the trial court held a hearing on appellees' plea as scheduled. On April 11, 2024, appellants filed a sur-reply, arguing, among other things, their entitlement to depose Jacob and Tate. On April 24, 2024, the trial court signed an order granting appellees' plea to the jurisdiction

and dismissing appellants' claims. The trial court never explicitly ruled on appellants' motion for a continuance or on the pending discovery motions.

On appeal, appellants generally restate the arguments they made to the trial court regarding jurisdictional discovery, and they argue based on summary-judgment analogies. According to appellants, the federal rules of civil procedure entitle an opposing party to depose a summary-judgment affiant "before a court treats their assertions as proven fact."[17] Appellants also reference the supreme court's guidance that a trial court, "should hear evidence as necessary to determine the [jurisdictional] issue [raised in a plea] before proceeding with the case." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). However, appellants do not assert any standard of review. Appellees, for their part, argue the trial court did not abuse its discretion by limiting discovery.

Under these circumstances, appellants complain about the trial courts' implicit denial of their motion for a continuance to seek additional discovery. *See* TEX. R. APP. P. 33.1(a)(2)(A) (allowing preservation of appellate complaint where trial court "ruled on the request, objection, or motion, either expressly or implicitly."). Appellants requested a continuance, but the plea hearing proceeded as scheduled. Further, appellants' motion and sur-reply requested that the trial court delay ruling on the plea until appellants completed jurisdictional discovery, but the trial court granted the plea soon after appellants filed their sur-reply. *See Rest. Teams Int'l, Inc. v. MG Sec. Corp.*, 95 S.W.3d 336, 338 (Tex. App.—Dallas 2002, no pet.) (holding trial court implicitly denied

---

[17] We do not find the cited federal cases persuasive because none of the cases consider the appropriate Texas standards, and Texas standards allow for consideration of uncontroverted written testimony in some instances. *See* TEX. R. CIV. P. 166a(c) (allowing summary judgment based on uncontroverted testimonial evidence that is "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted"); *Raoger Corp. v. Myers*, No. 23-0662, 2025 WL 1085173, at *6 (Tex. Apr. 11, 2025) (affirming denial of motion for continuance of summary judgment hearing, despite the nonmovant's instance that he needed additional time to depose the movant's owner, who testified by interrogatory answers).

motion for continuance when it held a hearing on a summary judgment motion and granted the motion).

Although we have never written directly on the matter, other Texas intermediate appellate courts have applied an abuse-of-discretion standard when reviewing a trial court's decision on whether to grant a continuance of a plea hearing to allow additional discovery.[18] *See, e.g., Osman v. City of Fort Worth*, No. 02-21-00117-CV, 2022 WL 187984, at *6 (Tex. App.—Fort Worth Jan. 20, 2022, pet. denied); *Quested v. City of Houston*, 440 S.W.3d 275, 280 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Patten v. Johnson*, 429 S.W.3d 767, 776 (Tex. App.—Dallas 2014, pet. denied). Relatedly, the Texas Supreme Court has applied an abuse-of-discretion standard when reviewing the denial of a motion for continuance seeking additional discovery in a special-appearance context, *see BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002), and a summary judgment context, *see Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004). Thus, we frame the issue as whether the trial court abused its discretion by denying appellants' motion for continuance seeking additional jurisdictional discovery, and we agree with our sister courts that the matter is reviewed for an abuse of discretion.

"A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Joe*, 145 S.W.3d at 161. In a traditional-summary-judgment context, the supreme court has specified three "nonexclusive factors when deciding whether a trial court abused its discretion in denying a motion for continuance seeking additional time to conduct discovery: the length of time the case has been on file, the materiality

---

[18] We have only written on the nearly opposite matter, holding that a trial court abuses its discretion "when it *delays* ruling on a jurisdictional plea for the purpose of *allowing* discovery unnecessary to the jurisdictional challenge." *In re Bexar Medina Atascosa Ctys. Water Control & Improvement Dist. No. One*, No. 04-24-00538-CV, 2025 WL 466069, at *4 (Tex. App.—San Antonio Feb. 12, 2025, no pet. h.) (emphases added).

and purpose of the discovery sought, and whether the party seeking the continuance has exercised due diligence to obtain the discovery sought." *Id.*

We hold the trial court did not abuse its discretion by denying appellants' motion for continuance. Discovery disputes became apparent early on in this case and well before the trial court ruled on appellees' plea. Nevertheless, appellants had not sought a hearing or obtained rulings on their motions to compel before the trial court ruled on the plea. Moreover, while appellees filed the Jacob declaration and the Tate affidavit the day before the plea hearing, they also filed this evidence shortly after appellants amended their petition to allege the City's intent for the first time. In this light, it is understandable that the declaration and affidavit were filed only the day before the plea hearing. In their sur-reply, appellants asserted the importance of deposing Jacob and Tate; yet they never noticed these individuals for depositions during the two weeks appellants had to file a sur-reply, and appellants' counsel provided no timeframe by which he intended to pursue depositions. Altogether, these circumstances suggest that appellants had not exercised all "due diligence to obtain the discovery sought." *Id.*; *see Raoger Corp. v. Myers*, No. 23-0662, 2025 WL 1085173, at *6 (Tex. Apr. 11, 2025) (noting summary-judgment nonmovant did not attempt to request an earlier deposition date of movant's owner, whose deposition was scheduled for after the summary-judgment hearing, when affirming trial court's denial of a continuance).

Additionally, all of the matters counsel asserted that he wished to explore were tangential to the ripeness question. According to counsel, he intended to explore the intents and beliefs of city officials and nonparty abortion-assistance organizations regarding the scope of the Reproductive Justice Fund and their plans with respect to the fund. However, the subjective intents and beliefs that appellants wished to explore would not directly determine the expenditure of

municipal funds. As Jacob and Tate explained, an RFP process would begin the City's solicitation; applicants would then apply; Metro Health would identify potential recipients of money; and last the city council would vote to approve any contracts for the expenditure of funds. As to the city actors, exploration of their intents and beliefs regarding undecided policy matters could lead to an excessive intrusion upon "the policymaking domains of [a] politically accountable branch[] of government." *Patterson*, 971 S.W.2d at 443. Under the circumstances, we cannot say that the trial court's denial of the continuance appellants sought for additional discovery "was so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Joe*, 145 S.W.3d at 162 (holding trial court did not abuse its discretion by denying motion for continuance of summary judgment hearing where discovery sought was immaterial); *cf. Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 491 (Tex. 2012) ("[C]ourts should allow 'reasonable opportunity for targeted discovery' if necessary to illuminate jurisdictional facts in a plea to the jurisdiction." (quoting *Miranda*, 133 S.W.3d at 233)).

## CONCLUSION

We affirm the trial court's order granting appellees' plea to the jurisdiction.

Rebeca C. Martinez, Chief Justice